**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Viento Lynn CHILDS, Defendant–Appellant.**

**No. 90–30429.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 9, 1991.

Decided Sept. 6, 1991.

Paul S. Petterson, Asst. Federal Public Defender, Portland, Or., for defendant-appellant.

Leslie K. Baker, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before GOODWIN, ALARCON and HALL, Circuit Judges.

ALARCON, Circuit Judge:

Viento Lynn Childs appeals from the denial of her motion to suppress evidence seized without a warrant from a houseboat she and Robert Moore shared as their residence. The district court concluded that Moore's voluntary consent to the search justified the officers' failure to obtain a warrant.

Childs seeks reversal on the following grounds:

One. The district court erred as a matter of law in concluding that law enforcement officers are not required to obtain a valid consent from *each* joint occupant, who is physically present, to justify a warrantless search.

Two. The district court's finding that Moore's consent was voluntary is clearly erroneous.

Three. A consent to search is invalid if it is obtained following an unnecessary delay in taking the arrested person before a magistrate.

Four. A consent to search is invalid if it is obtained after a person has invoked his or her right to the assistance of counsel during custodial investigation.

We affirm because we conclude that (1) a joint occupant's voluntary consent is sufficient to justify a warrantless search regardless of the physical presence of the other occupant, and (2) the district court did not clearly err in finding that the consent of the co-occupant was voluntary.

I

PERTINENT FACTS

We summarize the evidence in the light most favorable to the trial judge's decision on a motion to suppress. *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1988). In February 1990, the Multnomah County Sheriff's Office received information that Childs and Moore were distributing tar heroin. The informant reported that Childs and Moore lived in a houseboat. The informant also informed the Sheriff's Office that Childs and Moore sold tar heroin from a black and yellow taxi cab.

To verify this information, officers of the Multnomah County Sheriff's Office conducted a surveillance of the activities of Childs and Moore. The officers observed Childs and Moore conduct a narcotics transaction in a black and yellow cab. The officers also located the houseboat residence of Childs and Moore. The boat was named "Graciosa."

On March 9, 1990, and March 10, 1990, the officers used informants to make controlled purchases of heroin. A $3,000 controlled purchase was arranged for March 13, 1990. An informant advised the officers conducting the surveillance that Childs and Moore did not have any heroin to transport. Childs and Moore told the informant that they would be traveling to Salem to purchase heroin from a Mexican male.

On March 13, 1990, law enforcement officers of a multi-agency task force followed Childs and Moore as they drove from their houseboat to a residence. There, Jose Miguel Salgado entered the car driven by Moore.

Moore drove the car past Salem to a rest stop about 100 miles from Portland. There, Salgado was observed conferring with another Hispanic male. After this encounter, Moore drove the vehicle across an overpass to the north-bound lanes of the I–5 freeway toward Portland.

Based on the totality of the information concerning the activities of Childs and Moore, the officers concluded that a narcotics transaction occurred at the rest stop. As their vehicles approached Salem, the officers, after conferring by telephone with a federal prosecutor, decided to stop Moore's vehicle. While they were arranging for a marked police car to effect the stop, Moore abruptly pulled to the side of the freeway and parked. Because of the manner of the stop and the location, the officers formed the belief that the occupants of Moore's vehicle were planning to flee or dispose of evidence of a crime.

The officers drew their weapons, pulled the vehicle's occupants from the vehicle and ordered them to lie on the ground while they were being handcuffed.

A search of the car revealed 125 grams of tar heroin in a plastic bag on the rear seat of the car. The car had a cellular phone in the front compartment and another in the back-seat area. A small amount of tar heroin was found in Childs' purse.

Childs was advised of her constitutional rights by Detective James Miller of the Salem Police Department at the scene of the arrest. She waived her rights and made a brief statement. Because of the danger of continuing their investigation on the freeway shoulder, at 2:45 p.m., the officers transported Childs, Moore, and Salgado to the Salem Police Department. They arrived at the police station approximately fifteen to twenty minutes later.

Childs was taken to a small interview room where she was handcuffed to a metal table. Officer Douglas Alan Ross, of the Grisham Police Department, interviewed Salgado first. Shortly before 4:00 p.m., Officer Ross entered the interview room where Childs was being detained. Officer Ross asked her if she understood the rights explained to her at the scene of the arrest. Childs replied affirmatively.

Officer Ross asked Childs biographical questions to fill out the custody report. He also asked her one question about her personal usage of heroin. She answered this inquiry and then requested counsel. Officer Ross terminated the interview and left the room.

Officer Ross then conferred with the Commander of the Narcotics and Vice Detail of the Salem Police Department. Officer Ross was instructed to return and ask Childs if she consented to a search of the houseboat.

Officer Ross asked Childs if she would consent to a search of the "Graciosa" and handed her a "Consent to Search" form. Officer Ross told Childs that he would probably apply for a search warrant if she refused to consent. He also told her that he disliked persons who sell drugs. Childs signed the consent form at 4:03 p.m., within four or five minutes after Officer Ross entered the interview room. After obtaining Childs' consent, Officer Ross went to another interview room to speak to Moore. Officer Ross asked Moore if he had understood the advice concerning his constitutional rights that he had received at the scene of the arrest from Sergeant Bunnell of the Multnomah County Sheriff's Office. Officer Ross informed Moore that Childs had consented to a search of the houseboat and showed Moore the consent form she had signed. Officer Ross read another consent form to Moore. The form recites that a person may refuse to sign it.[1] Moore consented to a search of the "Graciosa" and signed the form at 4:13 p.m. Thereafter, Moore was interrogated on his activities on that date, Childs' heroin addiction, and the amount of money she requires to support it. Officer Ross described Moore "as very cooperative."

At approximately 4:30 p.m., Childs and Moore were transported to Portland. On March 15, 1990, Moore and Salgado were taken before a magistrate. Childs was not taken before a magistrate until March 19, 1990.

A search of the houseboat disclosed color-coded plastic bags containing varying amounts of tar heroin, two scales, material for packaging, drug records, $1,000 in cash, two fire alarms, and a police radio.

At the suppression hearing, Moore testified that he initially stated that he did not

---

1. The consent to search form provides in pertinent part:

    BEFORE ANY SEARCH IS MADE, YOU MUST UNDERSTAND YOUR RIGHTS.
    (1) You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the property described below.
    (2) I am aware that I have the right to refuse to consent to seize my property, my premises, or property within my custody or control. I do hereby freely, voluntarily and knowingly, without threat or promise by any person, authorize and consent to the search and seizure of the items described in the attached inventory. I understand that this may result in criminal charges and/or forfeiture (loss) of the property.
    I HAVE READ THE ABOVE STATEMENT OF MY RIGHTS AND UNDERSTAND THESE RIGHTS.
    I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT OF THE FOLLOWING ... "Graciosa"....

want to sign the consent form. Officer Ross testified that no such statement was made to him. Moore also testified that Officer Ross told him that he would get a 10–year sentence if he did not cooperate. Officer Ross denied making that statement. Moore further testified that when Officer Ross displayed Childs' signed consent form, Moore was told that it is already signed so he might as well do so also. Moore said that he then "cooperated." The district court expressly found that Moore's testimony was not credible.

The district court concluded that Moore voluntarily consented to a search of the houseboat. Citing this circuit's decision in *United States v. Yarbrough,* 852 F.2d 1522 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988), the district court ruled that since the valid consent of one joint occupant justifies a warrantless search, it was not necessary "to get to the issue of [Childs'] consent for the reasons I have already stated."

## II

## DISCUSSION

### A. *Effect of Voluntary Consent by a Person in Common Authority*

■ Childs argues that "[w]here both householders are arrested and questioned contemporaneously, valid consent from both should be required in the absence of a judicial search warrant." Appellants Br. at 13. We review *de novo* a district court's interpretation of the law. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court held that:

[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

*Id.* at 171, 94 S.Ct. at 993. In *United States v. Yarbrough,* we held that consent of a person who has "joint access or control" over property with others can authorize a search. 852 F.2d at 1534. We also noted that persons who have joint access or control "assume[ ] the risk that the third parties might consent to the search." *Id.*

Childs argues that the *Matlock* rule only applies when the co-occupant who challenges the search was physically absent at the time the other joint occupant consented to the search. We disagree. Childs has ignored the factual setting before the Supreme Court in *Matlock.* The defendant in *Matlock* was arrested in his front yard. 415 U.S. at 166, 94 S.Ct. at 991. The officers did *not* ask him whether he would consent to a search. *Id.* Instead, the officers obtained a consent to search from a woman, also present on the premises, who shared the house with Matlock and her mother. *Id.* Nevertheless, the Supreme Court concluded that the co-occupant's consent, standing alone, was sufficient to permit a warrantless search, notwithstanding Matlock's physical presence on the premises. *Id.* at 171, 94 S.Ct. at 993.

In *United States v. Canada,* 527 F.2d 1374 (9th Cir.1975), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976), the appellant contended that "the cases which upheld third-party consent all involved absentee defendants." *Id.* at 1379. We rejected this argument in *Canada. Id.* We reasoned as follows:

To refute this proposition, one need look no further than the leading case appellant cites, *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There, the defendant was arrested in the yard of the house where he was staying. The officers did not ask his consent to search the house. They went to the door and obtained permission to search from a woman who was living there with him. The Court looked not to the defendant's presence or absence but to whether or not the third party "possessed common authority over or other sufficient relationship to the premises or

effects sought to be inspected." 415 U.S. at 171, 94 S.Ct. at 993.

*Canada,* 527 F.2d at 1379.

Childs argues that *Canada* should be limited to cases involving joint ownership of personal property. This contention is unpersuasive. It overlooks the fact that in *Canada,* we relied on *Matlock* as evidenced by the passage quoted in the preceding paragraph. *Matlock* dealt with common authority over a residence.

Because we conclude that our interpretation of *Matlock* in *Canada* is applicable to all forms of property, we hold that the valid consent of a person with common authority will justify the search of a residence even if the co-occupant is physically present.

■ For the first time in this appeal, Childs asks this court to hold that, if the evidence shows that the defendant's consent is invalid, the voluntary consent of his co-occupant is void as a matter of law. Childs points out that in *Lucero v. Donovan,* 354 F.2d 16 (9th Cir.1965), we held that the consent of a co-occupant is ineffective if the other person who has common authority protests. *Id.* at 21.

No showing has been made in this matter that Childs protested the search of the houseboat. Childs did not ask the district court to find from the disputed evidence that her consent was invalid, as a foundation for a ruling that Moore's consent was also ineffective as a matter of law.

■ "As a general rule, an issue not presented to the trial court cannot be raised for the first time of appeal." *United States v. Whitten,* 706 F.2d 1000, 1012 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). Where the issue not raised below involves a purely legal question, however, we have the discretion to consider the issue. *See United States v. Hayden,* 860 F.2d 1483, 1485 (9th Cir.1988) (we addressed the question whether the district court improperly dismissed portions of indictments under Rule 48(b), even though issue was raised for first time on appeal). Childs' argument does not present a purely legal issue. Instead, it would require a preliminary factual finding that her consent was obtained involuntarily. As appellate judges, we are not authorized to make findings of fact or weigh the evidence. Furthermore, it would be unfair to the trial court and the Government for us to decide disputed questions of fact not presented during the suppression proceedings. Accordingly, we decline to consider the question whether evidence credited by a trial court, showing that the consent of one joint occupant is invalid, will, as a matter of law, nullify the voluntary consent of another person who has common authority.

The district court did not err in concluding that, if a law enforcement officer obtains the voluntary consent of a person with common authority, a warrantless search is valid without a showing that other persons who have the right to equal possession also consented.

#### B. *Voluntariness of Moore's Consent*

■ Childs asserts that Moore's consent was invalid because it was the tainted fruit of the alleged invalidity of Childs' consent. The district court did not determine whether Childs' consent was invalid because it was coerced or if it was inadmissible because it was solicited by an officer after Childs had exercised her constitutional right to counsel. Instead, the district court found that in consenting to the search, Moore did not rely on Childs' consent. We must determine whether the record supports the trial judge's findings.

■ A district court's factual findings in support of its conclusion that a person voluntarily consented to a search are reviewed for clear error. *United States v. Shaibu,* 920 F.2d 1423, 1425 (9th Cir.1990). Voluntariness is a question of fact that is determined by considering the totality of the circumstances. *United States v. Lindsey,* 877 F.2d 777, 783 (9th Cir.1989).

Childs appears to argue that a consent obtained following an arrest at gun point is invalid as a matter of law. She cites no authority to support this contention. In *United States v. Al–Azzawy,* 784 F.2d 890 (9th Cir.1985), *cert. denied,* 476 U.S. 1144,

106 S.Ct. 2255, 90 L.Ed.2d 700 (1986), we upheld the district court's determination that the defendant's consent was involuntary. *Id.* at 895. In *Al–Azzawy,* the record showed that the officers' guns were drawn and the defendant was on his knees, with his hands on his head, when he was asked for his consent. *Id.* The defendant in *Al–Azzawy* was not advised of his *Miranda* rights. *Id.* In the instant matter, Moore was advised of his *Miranda* rights contemporaneously with his arrest.

While the record shows that the officers drew their guns prior to placing handcuffs on Moore, he consented more than an hour later at the Salem Police Department. Childs does not contend, nor does the record show, that Officer Ross' gun was out of its holster at the time Moore consented.

■ The consent form clearly states that a person may refuse to sign it. Knowledge of the right to refuse consent is highly relevant in determining whether a consent is valid. *United States v. Mendenhall,* 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879–80, 64 L.Ed.2d 497 (1980).

The record shows that Moore was very "cooperative." Childs' consent was limited to a search of the "Graciosa." Moore consented to the search of his taxi cab and another vehicle as well as the "Graciosa." We have previously stated that the "[e]xecution of a consent form is one factor that indicates that consent was voluntary." *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1988). We also stated in *Castillo,* that whether the defendant was told that a search warrant could be obtained may also be considered. *Id.* We also stressed, however, that the fact that one or more of these factors is not proven does not automatically demonstrate that the consent was involuntary. *Id.*

The record supports the district court's finding that Moore's consent was voluntary. He was advised of his *Miranda* rights, he was informed that he could refuse consent, he signed a consent form, and he was not subjected to any coercion. Under these circumstances, we conclude

that the district court did not clearly err in finding that Moore's consent to search the houseboat was voluntary.

C. *Effect of Mallory v. United States on Moore's Consent.*

■ Childs alleges that Moore's consent is invalid because he was not taken to a federal magistrate without unnecessary delay. In support of this proposition, Childs relies on *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and this court's decision in *United States v. Sotoj–Lopez,* 603 F.2d 789 (9th Cir.1979).

Each of these cases deals with the effect of delay in taking a prisoner before a magistrate on the admissibility of a confession. We also note that 18 U.S.C. § 3501(c) provides that a voluntary confession "shall not be inadmissible solely because of delay in bringing [the defendant] before a magistrate ... if such confession was made or given by [the defendant] within six hours immediately following his arrest or other detention." In this matter, the undisputed evidence shows that Moore's consent was voluntarily obtained within approximately two hours of his arrest.

We need not decide in this matter, however, whether *Mallory* applies to a voluntary consent. We held in *United States v. Cluchette,* 465 F.2d 749 (9th Cir.1972), that *Mallory* does not apply where the defendant has waived his *Miranda* rights. *Id.* at 754. Moore waived his *Miranda* rights in this matter. Thus *Mallory* would be inapplicable, even if we were to rule that it applies to a voluntary consent.

D. *Impact of the Miranda–Edwards Rule on the Validity of a Consent.*

Childs asserts that her consent is invalid because it was obtained during a conversation initiated by Officer Ross after Childs invoked her right to counsel. We have concluded that the district court did not clearly err in finding that Moore consented to the search of the houseboat and that he did not rely on the fact that he was informed of Childs' consent before signing the consent form. We have also held in

this matter that Moore had common authority over the houseboat and that his voluntary consent was sufficient, standing alone, to justify a search of his residence, in the absence of any proof that his co-occupant protested against a search. Under these circumstances, it is unnecessary for us to determine whether Childs' consent was invalid because she did not initiate the conversation that resulted in her consent after she had invoked her right to counsel.

AFFIRMED.