38 F.3d 1219
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Warren Theo TRENHAILE, Defendant-Appellant.
 No. 93-10432.
 United States Court of Appeals, Ninth Circuit.
 Submitted Aug. 9, 1994.*
Decided Oct. 18, 1994.
 
 1
 Before: FLETCHER, HALL, and WIGGINS, Circuit Judges
 
 
 2
 MEMORANDUM**
 
 
 3
 Appellant Warren Theo Trenhaile appeals his conviction and sentence for conspiracy to import and distribute more than 500 grams of cocaine and for importation of more than 500 grams of cocaine. The smuggling scheme was organized by coconspirator Malcolm Greyson while he was incarcerated in Oahu Community Correctional Center pending trial on unrelated state charges. The cocaine was to be smuggled from Bolivia to the United States inside specially-constructed electric guitars (code-named "paddles" by the conspirators). Appellant was initially recruited by Greyson to help fabricate the guitars.
 
 
 4
 Appellant and four coconspirators were charged with conspiracy to import cocaine, in violation of 21 U.S.C. Secs. 952(a), 960(b)(2), 963, conspiracy to distribute, and possess with intent to distribute, cocaine, in violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(1)(B), 846, and importing cocaine into the United States, in violation of 21 U.S.C. Secs. 952(a), 960(b)(2). Appellant filed a motion to suppress the evidence derived from the search for which he signed a consent form, as well as that evidence subsequently seized from the same location, based on the "fruit of the poisonous tree" doctrine. The motion was denied. During trial, Appellant moved for severance, mistrial, and, after trial, new trial based on the claim that his right to a fair trial was prejudiced because codefendant Greyson had been implicated in fabricating evidence and perjury. Each of those motions was denied. Appellant was found guilty on all counts by a jury on March 19, 1993. The district court sentenced Appellant to 240 months of imprisonment, followed by 8 years of supervised release.
 
 1. Suppression
 
 5
 On June 29, 1992, officers, armed with a search warrant listing the address of Appellant's mother's residence as the place to be searched, learned that Appellant actually resided in a separate neighboring apartment. Appellant signed a form consenting to the search of his apartment. Addresses pertaining to the conspiracy were found, and Appellant was arrested. A new search warrant was acquired later that day, and officers returned to seize pieces of guitars spotted earlier in the carport.
 
 
 6
 Appellant testified that he suffered from epilepsy and rheumatoid arthritis, and was taking prescription medicines for those conditions. The search occurred shortly after midnight on June 29, 1992, after Appellant had taken his medication and had gone to bed. Appellant testified that he was sleepy when he opened the door to his apartment to find his mother accompanied by police officers, and that some of the officers kept their sidearms unholstered after entering his apartment. The DEA agent in charge (Strother) later testified that he informed Appellant that they could apply for an amended search warrant, which might or might not be granted, and asked Appellant if he would consent to the search of his apartment; Appellant answered in the affirmative. Agent Strother then left and returned with the consent form. Appellant did not recall being informed of his right to refuse his consent to the search, and argues that the consent-to-search form did not mention the right to refuse consent. The form stated:
 
 
 7
 1. I have been asked to permit special agents of the Drug Enforcement Administration to search [Appellant's residence].
 
 
 8
 2. I have not been threatened, nor forced in any way.
 
 
 9
 3. I freely consent to this search.
 
 
 10
 The form was signed and dated, with the exact time, by Appellant. ER 30. Appellant claimed that his understanding was that if he signed the form, he could be present so that his apartment would not be "ripped apart."
 
 
 11
 Appellant argues that the search of his apartment was in violation of the Fourth Amendment because the consent he gave was not voluntary. Appellant argues that, had he been aware of his right to refuse consent and able to think more clearly, he would not have allowed the agents to search. He claims that the facts that he was recently awakened and under the influence of prescription drugs support the conclusion that he was unable to appreciate what was going on and the significance of his actions. United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir.1986) (stating that question is not merely of intoxication, but whether consent was given by " 'one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions.' "). In addition, Appellant argues that his lack of knowledge of his right to refuse to consent to the search is "highly relevant" to the determination of whether the consent was validly given. United States v. Childs, 944 F.2d 491, 496 (9th Cir.1991).
 
 
 12
 The government responds that Appellant's consent (given twice orally and once in writing) was "freely and voluntarily given," Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), and that there is no requirement that he be warned of his right to refuse. United States v. Ritter, 752 F.2d 435, 438 (9th Cir.1985) (holding that Miranda warnings are not required before requesting consent to search). Furthermore, Appellant had time to consider his consent while Agent Strother went to the car to get the form. The government cites United States v. Lindsey, 877 F.2d 777, 783 (9th Cir.1989), where this court found voluntary consent despite the fact that the defendant had been handcuffed, in part because "after [the defendant] gave verbal consent, he had time to reconsider his decision while one of the police officers went to the police station to obtain a consent form." Id. at 783.
 
 
 13
 Motions to suppress are generally reviewed de novo, United States v. Khan, 993 F.2d 1368, 1375 (9th Cir.1993), but the trial court's factual findings are reviewed for clear error. United States v. Negrete-Gonzales, 966 F.2d 1277, 1282 (9th Cir.1992). The district court's factual finding that the defendant voluntarily consented to a search is reviewed for clear error. United States v. Hamilton, 792 F.2d 837, 841 (9th Cir.1986).
 
 
 14
 While Appellant is correct that the factors he discusses are relevant to the inquiry, he does not establish that it was a clear error for the district court to find that, as a matter of fact, the consent was voluntary and freely given. The written statement is strong evidence for that conclusion. The circumstances under which the consent was given were not clearly coercive. Lindsey, 877 F.2d at 777. There is little evidence of lack of consent beyond Appellant's assertions that his faculties were, in fact, significantly impaired by drowsiness or prescription drugs. The trial court would be within its rights to discount that testimony as colored by self-interest. We therefore affirm the district court's determination that Appellant's consent to search his apartment was valid.
 
 2. Tape Recordings
 
 15
 The district court admitted into evidence tape recordings and transcripts of phone calls between Appellant and an unindicted coconspirator (Jones). Jones placed three calls to Appellant from the Wichita Police Department in the very early morning hours of June 29, 1992, several days after Jones was arrested. The first call was not recorded due to an equipment malfunction. In the recording of the second call, Appellant's voice was occasionally recorded only in a volume so low as to be unintelligible. The third call recorded properly, until the equipment abruptly ceased functioning shortly before the end of the call.
 
 
 16
 At trial, the government offered as evidence the tape-recorded conversations and transcripts thereof. Appellant objected to the tapes on the ground that hearing only portions of the conversations would be misleading and prejudicial. Appellant similarly objected to the transcripts because they did not accurately reflect the entire, actual conversations. Over Appellant's objections, the district judge admitted the tapes, and allowed the jury to use the transcripts.
 
 
 17
 On appeal, Appellant makes little legal argument, and cites only United States v. McMillan, 508 F.2d 101 (8th Cir.1974), cert. denied, 421 U.S. 916 (1975) for the Eighth Circuit's requirements for admissibility of tape recordings. Appellant seems to raise an authentication or foundational argument on appeal. While Appellant did mention the "foundation" of the transcripts below, all of the objections were levelled at the completeness of the tapes and transcripts and their potentially prejudicial effect. Any argument that there was no foundation for the tapes has been waived.
 
 
 18
 The transcripts did not have to be authenticated because they were used only as a listening aid, and not admitted into evidence. See Fed.R.Evid. 901(a). Instead, the transcripts may be used if the judge takes certain steps, such as reviewing the transcripts for accuracy and issuing a limiting instruction. United States v. Booker, 952 F.2d 247, 249 (9th Cir.1991); United States v. Turner, 528 F.2d 143, 167-68 (9th Cir.), cert. denied sub nom. Grimes v. United States, 423 U.S. 996 (1975), and cert denied sub nom. Hackett v. United States, 429 U.S. 837 (1976). Appellant does not argue that those criteria were not met. We find no abuse of discretion in the district court's use of transcripts as a listening aid. Booker, 952 F.2d at 249 (holding that the use of transcripts is reviewed for abuse of discretion).
 
 
 19
 The only remaining issue is whether the district court abused its discretion by admitting unduly misleading or prejudicial tape recordings of the call. Questions of the admissibility of evidence which involve factual determinations, rather than questions of law, are reviewed for an abuse of discretion. United States v. Wood, 943 F.2d 1048, 1055 n. 9 (9th Cir.1991). "We review the district court's decisions balancing the probative value of evidence against its prejudicial effect for abuse of discretion." United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989).
 
 
 20
 Appellant's generalized assertions that the recordings were misleading and prejudicial are not sufficient to establish an abuse of discretion. Appellant asserts no specific reasons why the jury would be prejudiced by the recordings. Though certain portions of the recordings were inaudible, Jones was available for cross-examination and could have resolved (or at least acknowledged) any ambiguities that resulted from the unintelligible passages. The district court's decision to admit the recordings is affirmed.
 
 3. Sufficiency of the Evidence
 
 21
 The smuggling scheme planned by Greyson involved sending someone to Bolivia to meet contacts known to Greyson, Percy and Ely Von Borrie. The courier was to be Chana Jones ("Combs"), wife of conspirator Ervin Lee Jones ("Jones"). The Von Borries were to provide cocaine to Combs, and the cocaine was to be smuggled into the United States inside of the "paddles." Appellant possessed one-half of an envelope that would serve as identification of the courier to the Von Borries, who possessed the other half. Appellant showed the half-envelope to Jones when Jones went to Appellant's residence in mid-November 1991. Jones testified that Appellant said that Appellant would only give Jones the half-envelope when the guitars were finished.
 
 
 22
 Greyson provided to Jones the name of a guitar maker whom he thought would be able to fabricate the "paddles." The name and address of that company was found on a Rolodex card in Appellant's apartment. Guitar blanks and bodies were found at Appellant's apartment. Appellant now claims that his only involvement was painting the guitars.
 
 
 23
 Appellant gave the half-envelope to Jones in January 1992. Appellant also provided a loan of $400 for Combs's travel expenses. On her first trip to Bolivia, Combs encountered problems. She was met at the airport by someone who possessed the other half of the envelope, but was told that the Von Borries were not available and that the cocaine would not be advanced to the courier as planned. Combs was told that cocaine was available for $3,500 per kilogram, cash-and-carry. Combs called Jones, who, in turn, spoke to Appellant and Greyson. Greyson provided the name of an alternative contact, who did not prove useful. Appellant loaned Jones $3,500, who wired it to Combs to purchase one kilogram of cocaine. Jones testified that Appellant had, prior to Combs's return, said that he wanted to "cut out" Greyson from the cocaine smuggling. Combs returned to Hawaii with the drugs in one of the guitars. Jones testified that, as payment for the $3,500, Appellant received 18 ounces of the cocaine, about one-half of the shipment.
 
 
 24
 Preparations were made for a second trip to Bolivia. Appellant represented to Jones that Appellant had contacts in California who would purchase the cocaine. Appellant and others made two additional guitars. Combs again traveled to Bolivia in May of 1992, returning with 1 1/2 kg of cocaine. Pursuant to Jones's request, the guitar blanks and woodworking equipment were delivered to Appellant. The blanks and bodies were later found at Appellant's apartment. In June, Jones and Combs were arrested by Wichita police while the pair were travelling across the country. Telephone records showed that Jones had called Appellant a number of times while travelling. In addition, the tape recordings made after the arrests of Jones and Combs revealed Appellant's knowledge of the smuggling, including a discussion about using "the paddle" in returning to Hawaii.
 
 
 25
 Appellant claims that there is insufficient evidence to connect him to the conspiracy. He argues that there is no evidence that he ever had any contact with Greyson, and that "all Appellant did was to paint two guitars." Appellant's Opening Brief at 34. He claims that there was no evidence of an agreement by, or requisite intention on the part of, Appellant. He further claims that there is no evidence of his knowledge of the second trip to Bolivia, or that such trip was intended to result in the smuggling of cocaine.
 
 
 26
 There is sufficient evidence to support a conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or insubstantial on its face. United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991), cert. denied sub nom. Brandon v. United States, 112 S.Ct. 947 (1992).
 
 
 27
 Appellant's arguments are devoid of merit. Appellant was linked to the conspiracy by physical and documentary evidence, as well as extensive testimony by the coconspirators. As for substantive importation, Jones testified specifically that he gave 18 ounces of cocaine to Appellant. The evidence was ample to support Appellant's conviction.
 
 
 28
 4. Motions for Severance, Mistrial, and New Trial
 
 
 29
 During trial, Greyson testified that he had received two telegrams from Ely Von Borrie, which indicated the Von Borries had raised his bail money by selling a house, and that Greyson should send an "envoy" to pick up $40,000. Greyson claimed that Jones and Combs were supposed to retrieve the cash from Bolivia inside the guitars. Greyson offered into evidence his exhibit G-22, which he claimed was a true photocopy of the second telegram.
 
 
 30
 The government cross-examined Greyson and established that MCI had no record of the second telegram and that G-22 was a forgery made by altering and re-copying an authentic telegram.
 
 
 31
 Appellant was allowed to recross-examine Greyson, who testified that he had never informed Appellant of the telegram. Nevertheless, Appellant orally moved the district court for severance based on "spillover" prejudice to him over the forged evidence. The district court denied the motion. After Greyson had rested his case-in-chief, Appellant moved for mistrial on the same ground. The motion was denied. After trial, Appellant moved for a new trial on the same basis. The district court again denied the motion.
 
 
 32
 Appellant argues that Greyson's doctoring of the evidence created a "spillover" of prejudice onto Appellant, which deprived him of a fair trial. Appellant cites only United States v. Cuozzo, 962 F.2d 945, 950-51 (9th Cir.), cert. denied, 113 S.Ct. 475 (1992), which found no abuse of discretion in failing to sever because of a codefendant's admission, on cross-examination, of a prior conviction. The government likens this case to United States v. Candoli, 870 F.2d 496, 510 (9th Cir.1989), which affirmed the district court's refusal to sever where one defendant had been shown to have lied to the police.
 
 
 33
 The denial of severance and mistrial motions are reviewed for an abuse of discretion. United States v. Joetzki, 952 F.2d 1090, 1094 (9th Cir.1991). The denial of a motion for new trial is reviewed for an abuse of discretion. United States v. Steel, 759 F.2d 706, 713 (9th Cir.1985).
 
 
 34
 Appellant has not demonstrated an abuse of discretion by the district court.
 
 
 35
 A person who seeks reversal of the denial of a severance motion has the burden of proving "clear," "manifest," or "undue" prejudice from a joint trial that violates a substantive right. The evidence of prejudice must demonstrate that the accused was denied a fair trial.
 
 
 36
 Candoli, 870 F.2d at 510. In order for the "spillover" of prejudice to merit reversal, "the defendant must show that the district court's limiting instructions were insufficient for the jury to compartmentalize the evidence against each defendant." Id.; United States v. Jenkins, 785 F.2d 1387, 1394 (9th Cir.), cert. denied sub nom. Prock v. United States, 479 F.2d 855; and cert denied sub nom. White v. United States, 479 U.S. 889 (1986). Appellant makes no reasonable attempt at meeting that burden. It is clear, moreover, that the testimony clearly showed that Appellant was not connected with the fabricated telegram. He suffered no clear, manifest, or undue prejudice. We affirm the district court's denial of Appellant's motions for severance, mistrial, and new trial.
 
 5. Validity of Prior Convictions
 
 37
 Appellant argues that his prior conviction was invalid for ineffective assistance of counsel and should not have been taken into account in sentencing for the instant conviction. Appellant argues that the performance of his counsel at the time deprived him of the opportunity to withdraw his plea, the right to demand a speedy trial, and the right to appeal. The statute under which Appellant was sentenced permits a defendant to challenge the constitutionality of prior convictions for which his sentence is enhanced. 21 U.S.C. Sec. 851(c)(2); see Special Information as to Prior Drug Convictions of Defendant Warren Theo Trenhaile Pursuant to Title 21, United States Code, Section 851 (July 17, 1992).[1]
 
 
 38
 This court reviews the legality of a criminal sentence de novo. United States v. Quan-Guerra, 929 F.2d 1425, 1426 (9th Cir.1991). The district court's factual findings at sentencing are reviewed for clear error. United States v. Vea-Gonzales, 999 F.2d 1326, 1328 (9th Cir.1993).
 
 
 39
 The defendant bears the burden of proving by a preponderance of the evidence that the prior conviction is unconstitutional. 21 U.S.C. Sec. 851(c)(2); United States v. Newman, 912 F.2d 1119, 1121-22 (9th Cir.1990). In order to establish the invalidity of a conviction for ineffective assistance of counsel, the defendant must show that the performance of his counsel was deficient and that the deficient performance prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687 (1984). In order to show prejudice from ineffective assistance of counsel in the entry of a plea, Appellant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded [no contest] and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); Doganiere v. United States, 914 F.2d 165, 168 (9th Cir.1990), cert. denied, 499 U.S. 940 (1991).
 
 
 40
 In 1987, Appellant was charged with eight counts of cocaine trafficking in a Hawaii state court. Late in that year, Robert Goldberg became Appellant's lawyer. On April 13, 1988, Appellant pleaded no contest to two of the counts as part of a plea bargain in which the other counts would be dropped, no enhanced or consecutive sentencing would be sought, and notice would be given to the Hawaii Paroling Authority of Appellant's cooperation. Before accepting Appellant's nolo contendere plea, the state court inquired of Appellant as follows:
 
 
 41
 THE COURT: All right. Are you satisfied with the advice and the help that your lawyer has given to you?
 
 
 42
 THE DEFENDANT: Yes.
 
 
 43
 THE COURT: Okay, pay close attention to this question. Mr. Trenhaile, because once you answer, it will probably preclude you from changing your mind later. Do you have any complaints, at all, about the way that your lawyer has represented you in relation to these pleas? If you do, state them now or no court will listen to you.
 
 
 44
 THE DEFENDANT: No.
 
 
 45
 SER 255. The state court imposed a sentence of concurrent terms of twenty years for both counts. In February of 1990, Goldberg was replaced. (Goldberg's whereabouts are at present unknown.) Appellant was released on parole in March of 1991.
 
 
 46
 Appellant was arrested for the instant offense on June 29, 1992, and the special information was filed on July 17. On December 28, 1992, Appellant filed a petition challenging his 1988 conviction on the basis of ineffective assistance of counsel. Appellant alleged, in part, that Goldberg misrepresented the benefits available from the plea agreement, that Goldberg was absent from Hawaii during critical periods, that Goldberg had encouraged Appellant to hold off from changing his plea from no contest to not guilty until after sentencing, and that Goldberg never filed a notice of appeal as promised.
 
 
 47
 After hearing argument, reviewing transcripts, and accepting a stipulation of Appellant's intended testimony, the district court completely rejected Appellant's arguments. The court found Appellant's claims incredible, especially in light of the years that passed between the sentence and the challenge. The court "ma[de] it the finding of this Court," that it "disbelieve[d]" that Appellant wanted to withdraw his plea at the time of sentencing but his attorney advised otherwise. Instead, the court held Appellant to the statements made before the state court.
 
 
 48
 The district court rejected Appellant's allegations of deficient performance by Goldberg as nothing more than fabrications. We find no clear error in that determination. Failure to challenge the conviction at the time that Appellant was actually incarcerated does, as the district court found, indicate that Appellant had no qualms about the pleas he entered. Appellant's uncorroborated and unfalsifiable characterizations of the events at the time are, on the other hand, relatively weak evidence. Appellant did not establish by a preponderance of the evidence that his counsel's performance was deficient, and the district court's factual findings are not clearly erroneous.
 
 
 49
 Moreover, Appellant has not established prejudice from the allegedly deficient representation. He benefitted greatly from the plea bargain. Based at least in part on his cooperation, he was released on parole in under three years from the time of the plea, despite a mandatory twenty-year sentence on each count. Six additional counts were dropped. Appellant gives no indication of any defense or exculpatory evidence that might gain him acquittal. If he had gone to trial on all eight counts and the state had successfully argued for consecutive sentences, he would have faced the remainder of his life in prison, rather than a few years. Appellant has not proffered any reason to believe that he would have chosen to take such a great risk.
 
 
 50
 Therefore, Appellant has not established the necessary prejudice and his prior conviction must be considered valid. We affirm the district court's use of the prior conviction to enhance Appellant's sentence pursuant to 21 U.S.C. Sec. 851.
 
 CONCLUSION
 
 51
 Appellant's conviction and sentence are AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The Supreme Court has recently held that a right collaterally to challenge prior convictions may not lightly be implied. Custis v. United States, 114 S.Ct. 1732 (1994). The Court recognized, however, that Congress had specifically provided for collateral challenges in provisions such as 21 U.S.C. Sec. 851. "The language of Sec. 851(c) shows that when Congress intended to authorize collateral attacks on prior convictions at the time of sentencing, it knew how to do so." 114 S.Ct. at 1736. Appellant therefore may challenge the validity of his prior drug conviction pursuant to, and subject to the provisions of, that section